COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Humphreys and Huff
Argued at Alexandria, Virginia

**PUBLISHED**

TONY JONES

v.      Record No. 1219-18-4

PRO-FOOTBALL, INC., t/a
  THE WASHINGTON REDSKINS AND
  GREAT DIVIDE INSURANCE COMPANY[1]

OPINION BY
JUDGE ROBERT J. HUMPHREYS
FEBRUARY 12, 2019

FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

> Benjamin T. Boscolo (ChasenBoscolo Injury Lawyers, on brief), for
> appellant.
>
> Benjamin J. Trichilo (Eric J. Berghold; McCandlish Lillard, P.C., on
> brief), for appellees.

This appeal requires that we review the application of the term "average weekly wage,"

as defined by Code § 65.2-101, by the Workers' Compensation Commission (the "Commission")

to the computation of partial disability benefits for a professional football player who suffers a

work-related injury in the peculiar contractual circumstances common to players in the National

Football League ("NFL").

Appellant Tony Jones ("Jones") appeals the decision of the Commission awarding him

temporary total disability and permanent partial disability benefits for a work-related injury,

based upon an average weekly wage finding of $783.63. Jones argues that the Commission erred

in affirming the deputy commissioner's average weekly wage finding of $783.63 and that his

---

[1] The opinion from the Commission references the appellees as Washington Football, Inc., t/a Washington Redskins and Great Divide Insurance Company. As the appellant and the appellees have consistently referred to the appellees as Pro Football, Inc., t/a Washington Redskins and Great Divide Insurance Company, we will adopt that reference.

average weekly wage should be $6,115.38. Appellees, Pro-Football, Inc., t/a Washington Redskins and Great Divide Insurance Company (collectively "employer"), filed a cross appeal asserting that the Commission erred in finding that Jones remains partially disabled after July 17, 2017. Specifically, employer argues that any disability after that date is unrelated to Jones's injury and "is self-imposed because [Jones] would have been authorized to play professional football if he had merely asked his attending physician."

## I. BACKGROUND

On May 6, 2015, employer hired Jones as an undrafted free agent.[2] Pursuant to the collective bargaining agreement ("CBA") between the NFL and the NFL Players' Association, Jones signed a standard player contract with employer. The terms of Jones's standard player contract provided that he would earn an annual salary of $435,000 "[f]or performance of Player's services and all other promises of Player," or $318,000 if he suffered an injury and was placed on "injured reserve." Jones also received a signing bonus of $2,500.

Eric Schaffer ("Schaffer"), employer's General Counsel and Senior Vice President of Football Operations, explained that Jones's standard player contract provided for week-to-week payments and permitted employer the right to terminate Jones at any time.[3] Describing the

---

[2] Jones previously attended Northwestern University and played four years of college football as a wide receiver.

[3] Pursuant to paragraph eleven of Jones's standard player contract, titled "SKILL, PERFORMANCE AND CONDUCT,"

> Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory AS compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in

provisions of the standard player contract in greater detail, Schaffer explained that if Jones were selected for employer's final fifty-three-man roster, Jones would receive 1/17th of $435,000 for each week of the NFL's seventeen-week regular season where he remained on the roster. Alternatively, if Jones were injured and placed on injured reserve, he would receive 1/17th of $318,000 for each week of the regular season. Schaffer explained that the injured reserve designation prohibits other teams from claiming a player and guarantees an injured player the corresponding salary for as long as his injury lasts. Additionally, pursuant to the CBA, employer was required to release a player after recovering from an injury lasting less than six weeks, but not if the player's injury lasted longer than six weeks. Employer's "medical staff determine[d] the nature and extent of the injury, and the team determined what category these players go under."

On August 23, 2015, Jones suffered an injury to his right shoulder during football practice. Jones felt his shoulder dislocate after catching a pass and being tackled to the ground by a coworker. Jones wanted to "tough it out," but the injury affected his performance during practice.

Dr. Christopher Annunziata ("Dr. Annunziata"), employer's team physician, diagnosed Jones with a right shoulder capsular strain and recommended standard rehabilitation. While Dr. Annunziata found full motion and strength with no history of instability, he noted that Jones complained of "discomfort predominantly along the posterior right shoulder." Jones continued to fully participate in practice, but his discomfort persisted throughout the next few days.

---

effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

On August 30, 2015, an MRI of Jones's right shoulder revealed a labral tear. That same day, employer terminated Jones's employment. Dr. Annunziata conducted Jones's exit physical exam, as required by Jones's standard player contract, and cleared Jones to participate in full football activities.

Jones and employer subsequently negotiated and signed an injury settlement agreement. Under the terms of the agreement, executed by the parties on September 1, 2015, Jones received $1,142.86 for per diem preseason pay from August 30, 2015 through September 6, 2015, and $112,235.29 as consideration for a waiver of all rights under his contract.[4] Jones was never placed on injured reserve, and he became a free agent and could be signed by any other team. Training notes from early September 2015 indicate that although Jones reached an injury settlement agreement with employer, Jones would "follow through" with rehabilitation and "was set up for PT" in Flint, Michigan.

Jones returned to his home in the Flint, Michigan, area where he attended physical therapy multiple days each week. Employer paid for Jones's therapy. Jones also hired a personal trainer and worked out with him for a total of five hours each day. Jones's medical records reflect that he engaged in physical therapy from September 8, 2015 to November 12, 2015.

Between August 23, 2015 and January 25, 2016, Jones looked for work but was undergoing intense physical rehabilitation so that he could return to playing professional football. Jones found a paid internship with Merrill Lynch in January 2016, and the company

_____

[4] Both opinions from the deputy commissioner and the Commission acknowledge that the parties entered into an injury settlement agreement after Jones suffered an injury to his right shoulder. However, at oral argument, both parties conceded that the injury settlement agreement was never submitted to the Commission for approval. Therefore, the injury settlement agreement does not control our decision on appeal.

hired him full-time on April 23, 2016. However, Jones left his job at Merrill Lynch in July 2017 to take a job as an operations assistant with the University of Michigan football team.

Jones's medical records reflect that he visited with multiple physicians after returning to Michigan. On February 17, 2016, Dr. Charles B. Jackson ("Dr. Jackson"), an orthopedic surgeon and sports medicine specialist, evaluated Jones's right shoulder. Dr. Jackson diagnosed Jones with "[c]hronic strain [of the] right shoulder with impingement secondary to circumferential tear of the labrum, partial thickness rotator cuff tear, and humeral head translation[.]" Dr. Jackson opined that Jones required an arthroscopic surgery due to his failure to respond to conservative treatment and persistent symptoms. Dr. Jackson recommended that Dr. James R. Andrews ("Dr. Andrews"), another orthopedic surgeon and sports medicine specialist, perform the surgery.

On August 11, 2016, Dr. Andrews performed a right shoulder arthroscopic anterior and posterior labral repair, as well as a posterior capsular repair, on Jones's right shoulder. On November 30, 2017, Dr. Andrews opined in a progress note that Jones had "made great progress" with physical therapy and rehabilitation.

The record reflects that Jones attended postoperative visits with Dr. Andrews on February 1, 2017, May 1, 2017, and July 17, 2017. On July 17, 2017, Dr. Andrews reported that Jones "still feels a little stiff[,]" but that "[Jones] states he is approximately 60% to 70% at this point." Dr. Andrews also wrote the following:

> At this point we are pleased with his progress. We would like to release him to full activity. He can continue progressing his strength and range of motion on his own at the gym. The patient

will be beginning coaching at Michigan University.  We will
release him to full activity without restriction.

Dr. Andrews also noted that "[w]e will see the patient back on a p.r.n. basis."[5]

Dr. Andrews clarified his July 17, 2017 release in a "to whom it may concern" letter

signed and dated November 27, 2017.  According to Dr. Andrews,

Mr. Tony Jones was evaluated in my office on 07/17/2017, as a
follow-up to his 08/11/2016 right shoulder surgical procedure.

To clarify the plan from the associated office dictation, my
recommendation is that Mr. Jones is cleared, without restriction,
for the purpose of coaching.  He is not cleared to continue his NFL
playing career.  Should Mr. Jones decide to continue his playing
career, he would need further evaluation to be sure he could
withstand the physical demand of the NFL.

On December 18, 2017, Dr. Andrews completed a five-question questionnaire clarifying

his prior reports and interactions with Jones.  First, Dr. Andrews emphasized that he had only

released Jones to coach, explaining that he had not seen Jones since July 17, 2017, and that Jones

required "further follow-up" and evaluation before Jones could also be released to play

professional football.  Second, Dr. Andrews indicated that Jones had not communicated any

interest in resuming a career as a professional football player.  Third, Dr. Andrews indicated that

physical conditioning was recommended, "if not required," because Jones had not played

professional football since August 23, 2015.  Fourth, Dr. Andrews indicated that if Jones had

requested authorization to undertake a conditioning program that would enable him to either play

in the NFL or undertake a professional tryout, the authorization would have been granted.

Finally, Dr. Andrews indicated that if Jones was interested in pursuing a professional football

career in the NFL, no physical restrictions would preclude him from doing so.

---

[5] "PRN" is an abbreviation for the Latin phrase *pro re nata*, which means "for the
emergency; as occasion arises."  PRN, Webster's Third New International Dictionary (1993).

On July 7, 2017, Jones filed a claim alleging a work-related injury by accident to his right shoulder, which occurred on August 23, 2015. Jones sought an award of medical benefits, permanent partial disability benefits, and the following wage loss benefits: temporary total disability benefits from August 23, 2015 through January 25, 2016, temporary partial disability benefits from January 26, 2016 through August 10, 2016, temporary total disability benefits from August 11, 2016 through August 25, 2016, and temporary partial disability benefits from August 26, 2016, through the present and continuing.

On December 21, 2017, a hearing was held before the deputy commissioner. There, the deputy commissioner heard testimony from Jones and his agent, Jesse LeGrande, as well as Schaffer, and Herman Gray Broughton, a vocational rehabilitation expert. The parties stipulated that Jones suffered a compensable right shoulder injury on August 23, 2015.

During his testimony, Jones emphasized that football is his "passion." However, he explained that the window of opportunity to play professional football is small and that he started looking for other work opportunities to "have a plan B in case plan A didn't work out." Jones also confirmed that he had not seen Dr. Andrews since July 17, 2017, and that Dr. Andrews never communicated to him that he could return to playing professional football after intensive conditioning. However, Jones testified that if he were released by Dr. Andrews, he would "get back into it."

Dated January 18, 2018, the deputy commissioner's opinion awarded Jones temporary total disability benefits in the amount of $522.42 per week, based upon a pre-injury average weekly wage of $783.63, for the period August 11, 2016 through August 25, 2016. The deputy commissioner also awarded Jones permanent partial disability benefits in the amount of $522.42 per week, based upon a ten percent permanent partial disability of the right arm, for a period of twenty weeks beginning on November 7, 2017. Finally, the deputy commissioner awarded

medical benefits for Jones's right shoulder for as long as necessary, pursuant to Code § 65.2-603. The deputy commissioner denied other claimed periods of disability due to Jones's failure to make reasonable efforts to market his residual work capacity.

While the deputy commissioner made a number of factual findings, only two are relevant for the purposes of this appeal:  The calculation of Jones's pre-injury average weekly wage and the finding of Jones's continuing disability after July 17, 2017.

Notably, the parties did not agree upon Jones's pre-injury average weekly wage at the hearing before the deputy commissioner.  Jones argued that his average weekly wage should be $6,115.38, which he calculated by dividing his contractual $318,000 injured reserve salary by fifty-two weeks.  In contrast, employer argued that Jones's average weekly wage should be calculated by dividing $8,214.30—an amount including $5,714.30 in pre-season payments to Jones as well as his $2,500 signing bonus—by the number of weeks that Jones worked for employer.

The deputy commissioner did not adopt either position.  Pursuant to Code § 65.2-101(1)(b), the deputy commissioner noted that the exceptional circumstances of Jones's employment permitted a departure from the typical average weekly wage formula found in Code § 65.2-101(1)(a).  As a result, the deputy commissioner focused upon Jones's actual pre-injury earnings and determined that Jones's average weekly wage should be calculated by adding Jones's six checks received prior to his injury, signing bonus, and preseason payments, which totaled $12,310.90.  The deputy commissioner then divided $12,310.90 by the number of weeks that Jones worked for employer—May 6 to August 23, 2015.  The equation resulted in an average weekly wage of $783.63.  Explaining his refusal to adopt either party's calculation, the deputy commissioner stated the following:

> For the following reasons, we find it would be speculative for us to deviate from using [Jones's] actual earnings and calculate his

average weekly wage based on the yearly salary he would have received under the contract. To begin, we have sufficient evidence of pre-injury earnings upon which we can rely to compute the average weekly wage. Additionally, while we commend [Jones's] aspirations and do not question his athletic abilities and skills, we are unable to divine from the present record that he would have made the fifty-three-man team.

The deputy commissioner also found that Jones's standard player contract did not guarantee him a salary of $435,000 or $318,000. Rather, Jones's salary was contingent upon whether he survived all preseason cuts and made the final team roster, as well as whether he participated in all regular season games or was placed on injured reserve. Therefore, the deputy commissioner found that

> [I]t would be speculative to calculate [Jones's] average weekly wage based on a salary amount he might have or might not have actually received. Accordingly, we find he has failed to carry his burden of proving exceptional reasons exist compelling us to employ an alternative method to the typical formula of using actual wages earned prior to the date of accident to compute his average weekly wage.

On the issue of continuing disability, the deputy commissioner did not agree with employer's argument that Jones did not suffer any continuing disability after July 17, 2017. Rather, the deputy commissioner held the following:

> We do not believe Dr. Andrews's questionnaire response sufficiently proves [Jones] is yet able to perform his pre-injury job. Dr. Andrews stated less than a month before that [Jones] could not return to professional football. At that time, he indicated [Jones's] return to football would be contingent on an evaluation confirming "he could withstand the physical demand of the NFL." Dr. Andrews stipulated to a similar condition in the questionnaire response when he agreed [Jones] needed to go through a physical conditioning program before resuming his football career.

As a result, the deputy commissioner found that Jones remained partially disabled.

- 9 -

Both parties requested review of the deputy commissioner's opinion. Jones contended that the deputy commissioner erred in calculating his average weekly wage.[6] Employer, on the other hand, contended that any continuing disability after July 17, 2017, was not causally related to Jones's August 23, 2015 work injury.

In an opinion dated July 11, 2018, the full Commission affirmed the deputy commissioner. On the issue of Jones's average weekly wage, the Commission agreed with the deputy commissioner's analysis and calculation using Jones's actual earnings in the weeks preceding his right shoulder injury. Referencing this Court's decision in Chesapeake & Potomac Tel. Co. v. Williams, 10 Va. App. 516, 519-20 (1990), the Commission emphasized that "the purpose of calculating an average weekly wage is to approximate the employee's economic loss." The Commission then noted that Jones earned $12,310.90 in the weeks before his injury but that his contract "provided that he could be cut at any time" and that "there [was] no evidence [Jones] would have stayed with the team for the entire season and into the postseason." Thus, the Commission found that "to adopt the average weekly wage advocated by [Jones] would be too speculative . . . to approximate the economic loss suffered[.]" For that reason, the Commission concluded that the deputy commissioner properly calculated Jones's average weekly wage.

On the issue of Jones's continuing disability after July 17, 2017, the Commission found that Dr. Andrews only "released [Jones] to return to work in a non-professional football career." The Commission relied upon the November 27, 2017 letter from Dr. Andrews clarifying that Jones was only "cleared, without restriction, for the purpose of coaching" but was "not cleared to continue his NFL playing career." The Commission also relied upon Dr. Andrews's opinion that

---

[6] Jones also argued that the deputy commissioner erred in finding that he was not disabled as alleged and that he failed to market his residual work capacity. Those issues, however, are irrelevant to this appeal.

Jones "needed further evaluation to make that determination and also would require a physical conditioning program prior to returning to professional football." Accordingly, the Commission found that Dr. Andrews did not release Jones to return to his pre-injury employment as a professional football player and affirmed the deputy commissioner's finding that Jones remained partially disabled. This appeal follows.

## II. ANALYSIS

### A. Average Weekly Wage Calculation

"Under the Virginia Workers' Compensation Act, awards of compensation benefits are based upon the average weekly wage." Dinwiddie Cty. Sch. Bd. v. Cole, 258 Va. 430, 432 (1999) (citing Code § 65.2-101). "The commission is guided by statute in determining average weekly wage." Thorpe v. Clary, 57 Va. App. 617, 624 (2011) (quoting Ellen Kaye, Inc. v. Wigglesworth, 34 Va. App. 390, 394 (2001)). "The statutory 'guideposts' determine the methods 'by which the commission may base its finding of average weekly wage.'" Id. (quoting Meredith Constr. Co. v. Holcombe, 21 Va. App. 537, 539 (1996)). "The determination of an employee's 'average weekly wage' constitutes a 'question of fact to be determined by the [C]ommission which, if based on credible evidence, will not be disturbed on appeal.'" Key Risk Ins. Co. v. Crews, 60 Va. App. 335, 343 (2012) (quoting Pilot Freight Carriers, Inc. v. Reeves, 1 Va. App. 435, 441 (1986)).

Code § 65.2-101 defines the term "[a]verage weekly wage" within the meaning of the Act and governs its application. See Code § 65.2-101(1)(a). Pursuant to that statute, calculating an employee's average weekly wage usually involves a simple equation: "The earnings of the injured employee in the employment in which he was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury, divided by 52[.]" Id. However, "[w]hen the employment prior to the injury extended over a period of less than 52

weeks," the statute authorizes the division of the employee's earnings "by the number of weeks and parts thereof during which" he earned wages so long as "results fair and just to both parties will be thereby obtained." Id. Finally, Code § 65.2-101 vests the Commission "with wide discretion to depart from these general guidelines when 'exceptional reasons' would make the equation 'unfair' either to the employer or employee." Thorpe, 57 Va. App. at 625 (citing Dominion Assocs. Grp. v. Queen, 17 Va. App. 764, 766 (1994)); see also Code § 65.2-101(1)(b). "The reason for calculating average weekly wage is to approximate the economic loss suffered by an employee or his beneficiaries when there is a loss of earning capacity because of work-related injury or death." Williams, 10 Va. App. at 519-20 (quoting Bosworth v. 7-Up Distrib. Co., 4 Va. App. 161, 163 (1987) (emphasis omitted)).

On appeal, Jones argues that the Commission's application of Code § 65.2-101(1) "is unsupported by any interpretation of the plain language of the Act" or the evidence in the record. Jones argues that his average weekly wage should be $6,115.38 per week—$318,000 divided by fifty-two weeks—"because that is the average weekly wage of first-year football players" working for employer. According to Jones, the amount represents his pre-injury economic capacity as a professional football player. Further, Jones contends that the Commission unfairly assessed his capacity to make employer's final, fifty-three-man roster. Jones argues that he intended to continue working for employer but for his shoulder injury and that the Commission "had no basis to determine that [he] would not have continued as a football player, much less use that assumption offensively against" him.

Had Jones made the final team roster, his contractual agreement with employer set his salary at either $435,000 or $318,000—if he were placed upon injured reserve—and his average weekly wage would then be much easier to calculate. Here, Jones suffered an injury before making the final team roster. Employer also never placed Jones on injured reserve. Thus,

Jones's earnings as a football player for employer were entirely hypothetical. Accordingly, on this basis, the Commission determined that Jones's average weekly wage should be determined by his actual pre-injury earnings and not by speculative projections. Looking to the text of Code § 65.2-101, the statute provides several permissible methods of computing a claimant's average weekly wage. Notably, however, the statute is discretionary and permits the Commission to depart from its general guidelines when "exceptional reasons" would make the equation "unfair" either to the employer or employee. See Code § 65.2-101(1)(b). Mindful of this latitude, the deputy commissioner determined and the Commission agreed that the circumstances of Jones's employment were sufficiently exceptional after finding "no 'professional football player' case directly on point on this issue[.]"

Given the discretion provided by Code § 65.2-101 and the exceptional circumstances of Jones's employment, we cannot say that the record does not support the Commission's calculation of Jones's average weekly wage. Jones earned $12,310.90 in the weeks preceding his injury. Adding additional, unearned payments to that amount based upon the sheer conjecture that certain subjective performance measures would be met would require the Commission to speculate and not serve the purposes of the Act, which is to "approximate the economic loss suffered by an employee[.]" Williams, 10 Va. App. at 519-20 (emphasis and citation omitted).

### B. Disability after July 17, 2017

On cross appeal, employer argues that the Commission erred in finding that Jones remains partially disabled. Employer maintains that Dr. Andrews released Jones to full duty work on July 17, 2017, and attributes Jones's work limitations solely to a non-injury cause: Jones's "personal and self-limiting decision to pursue an administrative career, instead of undergoing the conditioning required for an NFL professional try out." In support of these

assertions, employer cites Jones's lack of contact with Dr. Andrews after July 17, 2017, as well as Jones taking jobs with Merrill Lynch and the University of Michigan football team. According to employer, the fact that Jones failed to remain in contact with Dr. Andrews and Jones's decision to pursue an alternative career indicates Jones's lack of interest in either undergoing conditioning or attempting a return to the NFL. Therefore, employer requests that this Court reverse the Commission's finding of Jones's continuing disability after July 17, 2017.

Employer also relies upon this Court's decision in Ridenhour v. City of Newport News, 12 Va. App. 415 (1991), to argue that Jones did not make reasonable efforts or exercise reasonable diligence in marketing his residual work capacity. As a result, employer argues that Jones is not entitled to continuing partial disability benefits. In Ridenhour, we held that a claimant who suffers partial disability need not be informed by his physician that he may undertake restricted work before the claimant is obligated to market his residual work capacity. See id. at 416. Rather, we concluded that a claimant is required to make reasonable efforts to market his residual work capacity when, considering all the facts and circumstances, the claimant should reasonably and objectively perceive that he can return to gainful employment. See id. at 418. Employer argues that a similar standard of reasonableness should apply to this case given Jones's supposed lack of interest in returning to play professional football.

"An award by the Commission is conclusive and binding as to all questions of fact." Newport News Shipbuilding & Dry Dock Co. v. Wardell Orthopaedics, P.C., 67 Va. App. 404, 412 (2017) (quoting Ford Motor Co. v. Favinger, 275 Va. 83, 88 (2008)); see also Code § 65.2-706(A). Whether a claimant suffers a continuing disability is a question of fact. See Hoffman v. Carter, 50 Va. App. 199, 216 (2007). Accordingly, "[w]e are bound by the commission's factual findings where those findings are supported by credible evidence in the record," regardless of whether contrary evidence exists or contrary inferences may be drawn.

Herbert Clements & Sons, Inc. v. Harris, 52 Va. App. 447, 452 (2008) (citing Tomes v. James City Fire, 39 Va. App. 424, 430 (2002)).

Mindful of our well-established standard of review, we affirm the Commission's finding of Jones's continuing disability. Reviewing the record, credible evidence supports the Commission's finding that Dr. Andrews only released Jones to work in a non-player football role with the University of Michigan football team. Neither Dr. Andrews's letter dated November 27, 2017, nor his questionnaire responses from December 18, 2017, indicate that Jones was medically released or authorized to play professional football. To the contrary, both clearly indicate that Dr. Andrews *did not* release or authorize Jones to continue his professional football career or begin a conditioning program. Further, employer's argument goes only to the weight of the evidence. "Matters of weight and preponderance of the evidence, and the resolution of conflicting inferences fairly deducible from the evidence, are within the prerogative of the commission and are conclusive and binding" upon this Court. Harris, 52 Va. App. at 458-59 (quoting Kim v. Sportswear, 10 Va. App. 460, 465 (1990)).

Employer's reliance on our decision in Ridenhour is also misplaced. Whether Jones reasonably marketed his residual work capacity does not influence the separate question of whether he remains partially disabled from his workplace injury, and we do not extend such a requirement as advocated by employer. See Code § 65.2-502(A) (requiring that an employer compensate a partially disabled employee for his "incapacity for work resulting from [his] injury . . . during such incapacity").

Finding credible evidence in the record to support the Commission's finding that Jones is not fully able to perform the duties of his pre-injury employment as a professional football player, we hold that the Commission did not err in finding that Jones remains partially disabled after July 17, 2017.

- 15 -

### III. CONCLUSION

For the foregoing reasons, the Commission's calculation of Jones's average weekly wage and its finding of Jones's continuing disability after July 17, 2017 are affirmed.

<u>Affirmed.</u>